*In re* MARRIAGE OF JANE ELIZABETH TATHAM, Petitioner-Appellee and Cross-Appellant, and JONATHAN EDWARD CHASE TATHAM, Respondent-Appellant and Cross-Appellee.

Fifth District   No. 5—87—0359

Opinion filed August 22, 1988.

1074

Bruce D. Stewart, of Harrisburg, for appellant.

Kenneth R. Hughes and William L. Broom III, both of Barrett, Twomey, Morris, Broom & Hughes, of Carbondale, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Jonathan Edward Chase Tatham (respondent) appeals from a judgment of the circuit court of Johnson County denying his post-trial motion and from the judgment dissolving his marriage to Jane Elizabeth Tatham (petitioner) entered on January 21, 1987. After consideration of respondent's post-trial motion filed on February 20, 1987, an amended judgment for dissolution was entered on April 13, 1987. Respondent appeals the amended judgment of dissolution as it pertains to the issues of the reimbursement of the marital estate for contributions from the nonmarital estate, of the award of a homemaker's contribution to petitioner, of the classification as marital property and valuation of certain items of personalty, and of the determination of the amount of child support to be paid by the respondent. Petitioner cross-appeals the judgment of dissolution with regards to the circuit court's denial of the award of maintenance and to the amount of petitioner's attorney fees that the circuit court ordered respondent to pay. We will not set out a statement of facts at this juncture, but delineate the pertinent facts as the issues are discussed.

The first issue respondent raises on appeal is that the circuit court erred when it ordered respondent to pay petitioner one-half of $65,600, the amount of the salary that respondent forwent soon after

the parties' marriage in June 1977. He argues that respondent's personal efforts as farm manager on his father's farm were to nonowned property as opposed to nonmarital property and therefore not subject to reimbursement to the marital estate. Alternatively, he contends that if the property was nonmarital, respondent's personal efforts were neither significant nor did his efforts result in substantial appreciation of the farm.

The evidence adduced at trial established that respondent's father, Arthur E. Tatham, purchased a 1,006-acre farm in Vienna, Johnson County, Illinois, in 1954. Although the farm was titled in respondent's father's name, respondent had lived on the farm since 1966. Respondent became manager of the farm in 1968 or 1969 and he continued in this employment after he and petitioner married. Respondent and petitioner were married on June 25, 1977, and they resided on the farm during the entire period of their marriage. Prior to the parties' marriage, respondent received a salary of $800 per month for his employment but shortly after their marriage, respondent elected not to receive this salary.

In December 1979, respondent's father established the Arthur E. Tatham trust (the trust). When the trust was created, Arthur Tatham transferred all of his assets into the trust, including the assignment of the title to the farm. Under the terms of the trust, Arthur Tatham was to be the sole beneficiary and the trustee of this revocable trust. However, upon his death, the remainder of the trust was to be divided equally between his three children, with a special provision that as part of his one-third share of the trust, if respondent was living 30 days after Arthur Tatham's death, respondent was to receive the farm. Upon Arthur Tatham's death, respondent and his two sisters were to become cotrustees of the trust if Arthur Tatham's wife were no longer living, with Jane Tatham Johnson to be acting trustee. Although Arthur Tatham made four amendments to the trust, at no time did he alter the provision regarding the farm, and thus this provision for the farm remained as stated in the original trust document at Arthur Tatham's death on September 5, 1985. Arthur Tatham's will provided that the residue of his estate, comprising the trust assets, was to be distributed in accordance with the provisions of the trust. A trustee's deed giving respondent title to the farm was executed on December 8, 1986, and was duly recorded on December 10, 1986, after the hearings regarding the division of marital property had been conducted but before the judgment of dissolution was entered.

In the judgment of dissolution entered on April 13, 1987, the circuit court determined that respondent had been receiving a salary of

$800 per month as farm manager prior to the parties' marriage but that after the marriage, respondent voluntarily ceased to collect this salary. The circuit court held that had respondent continued to collect this salary, this salary would have been part of the marital estate. Therefore, the circuit court found that respondent's refusal to accept a salary was a contribution by the marital estate to nonmarital property of the respondent for which the marital estate was entitled to reimbursement and that respondent's personal efforts were significant and resulted in substantial appreciation of the nonmarital property. For those reasons, the circuit court ordered respondent to pay petitioner $32,800 (one-half of the amount of salary that would have been paid had respondent continued to collect this salary during the entire marriage).

Respondent contends that the circuit court erred in determining that respondent's personal efforts were a contribution of the marital estate to the nonmarital estate. He argues that because title to the farm remained in the trust until December 1986, respondent's personal efforts can only be viewed as personal efforts to nonowned property as opposed to nonmarital property and therefore outside the purview of the statute. We do not agree.

■ Respondent's reasoning is erroneous for several reasons. Section 503(b) of the Illinois Marriage and Dissolution of Marriage Act states:

> "For purposes of distribution of property pursuant to this Section, all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage, including non-marital property transferred into some form of co-ownership between the spouses, is presumed to be marital property, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, or community property. The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (a) of this Section." (Ill. Rev. Stat. 1987, ch. 40, par. 503(b).)

From the language of the statute, for the purposes of distribution, consideration must be given to all property acquired by the parties of the marriage after the marriage and before the date of dissolution. In this case, the date of dissolution of the parties' marriage was April 13, 1987. If consideration is given to the transfer of title to the farm as indicative of when respondent acquired legal ownership of the farm, then the date of acquisition was December 8, 1986, before the

date of dissolution. Thus the farm must be considered in the circuit court's distribution of property, either as marital property or as nonmarital property, as it was owned by respondent at the date of dissolution. Next, we must determine if the farm was nonmarital property or marital property.

■ Under section 503(b), property acquired by the parties after a marriage and before the date of dissolution is presumed to be marital property. This presumption can be overcome by showing that the property was acquired in one of the methods set forth in section 503(a) of the Illinois Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1987, ch. 40, par. 503(a).) Section 503(a)(1) provides that the presumption that property acquired after the marriage is marital property is overcome by a showing that the property was acquired by gift, legacy or descent. (Ill. Rev. Stat. 1987, ch. 40, par. 503(a)(1).) Since the evidence in this case demonstrated that respondent's father's will directed that the residue of his estate be distributed in accordance with the provisions of the trust, and since the trust provided that respondent was to receive the legal ownership of the farm as part of his distributive share of the trust assets, respondent met the burden of overcoming the presumption that the farm was marital property. Therefore, the circuit court correctly categorized the farm as respondent's nonmarital property at the date of dissolution. However, our analysis of the nature of respondent's interest in the farm cannot cease here.

■ Under the terms of Arthur Tatham's trust, respondent obtained a future interest in the farm at the time of the creation of the trust. The trust provided that Arthur Tatham enjoyed a life estate in the farm and that respondent was to receive the farm by remainder in fee simple upon Arthur Tatham's death with the proviso that respondent survive his father by 30 days. Thus respondent acquired a beneficial interest, and therefore a property right, in the farm on December 11, 1979, the date of the creation of the trust. The granting of respondent's beneficial interest in the farm through the trust was equivalent to a "gift" as that term appears in the statute, so the beneficial interest was respondent's nonmarital property. Thus even if respondent had not had legal ownership of the farm at the date of dissolution, he had a beneficial interest in the farm, a sufficient interest in the property upon which to reimburse the marital estate for respondent's personal efforts contributed to that property. Under either analysis, the circuit court's determination that the farm was nonmarital property and that respondent's personal efforts towards the nonmarital property were a contribution by the marital estate was correct.

■■ ■ Respondent alternatively argues that even if the property was nonmarital, his personal efforts were neither significant nor resulted in a substantial appreciation of the farm as section 503(c) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 503(c)) requires, and, therefore, the circuit court erred when it determined the marital estate was entitled to reimbursement for those efforts. Respondent supports his argument that his personal efforts were not significant by stating that there was no evidence in the record detailing the work performed by the respondent and by noting that the farm sustained losses for every year except one since 1979. To the contrary, there is adequate evidence in the record that respondent's personal efforts were significant.

Respondent testified that he was farm manager from 1968 or 1969 to the present. His duty as farm manager was to manage the entire farm. When he first became farm manager, the farm was used exclusively for the raising of cattle. Subsequently, respondent attempted to grow row crops. When the growing of crops proved unsuccessful, respondent sought loans available from the government to offset this failure in an attempt to keep the farm operating. Respondent returned to the raising of cattle when he determined that growing crops was not a profitable use of the farm. The work on the farm was by respondent's sole efforts as he had not hired anyone to work with him since 1979. Respondent also constructed a riding stable and arena on the farm in late 1977 and early 1978, and he rents these facilities to bring in additional income to the farm. These efforts of respondent can only be viewed as significant.

Respondent relies on *In re Marriage of Morse* (1986), 143 Ill. App. 3d 849, 493 N.E.2d 1088, in support of his argument that the circuit court erred in finding his personal efforts significant. *Morse* can be distinguished factually from the instant case. In *In re Marriage of Morse* (143 Ill. App. 3d 849, 493 N.E.2d 1088), the circuit court ordered respondent to reimburse petitioner for her personal efforts to respondent's nonmarital insurance agency. In so ordering, the circuit court found that petitioner's personal efforts were both significant and resulted in substantial appreciation of the business. On appeal, this court concluded that petitioner's personal efforts did not rise to "significant effort" nor did her involvement lead to "substantial appreciation" of the insurance agency. In *Morse*, petitioner testified that she worked from one to three hours every day at the insurance agency. Additionally, she became a licensed insurance broker and sold two insurance policies. Her testimony was rebutted by respondent's witnesses. Petitioner was paid $50 per month and she either re-

ceived this check or had the check deposited into the insurance agency's account or the parties' personal account. The minimal involvement of petitioner in *Morse* does not compare with the totality of respondent's efforts in running and maintaining a 1,006-acre farm. We conclude that respondent's personal efforts in this case were significant.

Likewise, respondent's personal efforts substantially appreciated the value of the farm. Respondent states that the circuit court reasoned that the value of the farm was substantially appreciated by respondent's personal efforts on the basis that the value of the property increased from $260,000 at the date of the creation of the trust in 1979, to $352,100 at the time of trial. Respondent argues that since there is no indication that the $260,000 value assigned to the farm by Arthur Tatham at the time of the creation of the trust was the fair market value and that since this figure could represent either a higher or lower value than the farm was actually worth in 1979, the circuit court's determination that the farm was substantially appreciated was erroneous.

Upon a review of the circuit court's order of April 13, 1987, we find that the circuit court did not state that it was basing its determination of substantial appreciation upon the premise given by respondent. From the circuit court's order it cannot be determined what the factual basis was for its determination that the farm was substantially appreciated; however, we find that there was adequate evidence before the circuit court from which it could make this conclusion. Respondent had attempted to expand the profit of the farm by changing the use of the farm from cattle raising to growing crops. The fact that he was unsuccessful does not show that the farm did not appreciate, as the losses of the farm were due more to external factors than because of any actions of the respondent. Just as the Illinois Supreme Court held that appreciation in value cannot be determined by factors that are external from the marriage, likewise, the fact that crops failed because of external factors beyond the control of the parties to the marriage cannot be indicative that the property did not appreciate in value. (*In re Marriage of Komnick* (1981), 84 Ill. 2d 89, 417 N.E.2d 1305.) Because of respondent's efforts, a riding stable and an arena for show horses were constructed on the farm property. This addition substantially increased the value of the farm. Further, the fact that respondent continued the day-to-day operation of the farm and did not permit the farm to deteriorate was another factor that the circuit court may have considered. Whenever strenuous efforts are made to maintain property values against overwhelming external factors such

that it appears that the efforts were for naught, and especially in this time of ever-increasing problems besieging the agriculture industry, it cannot be said that the property was not substantially appreciated even though the application of numerical values may appear to belie those efforts.

The only evidence of value of the farm as of 1979 presented by either party was the value stated in the trust. Both parties' appraisers valued the farm in 1986 at a higher value than given in the trust. The evidence offered supports the circuit court's conclusion that the property did appreciate under respondent's management. Where there is competent evidence to support a circuit court's decision, we will not overturn its determination absent an abuse of discretion. (*In re Marriage of Mullins* (1984), 121 Ill. App. 3d 86, 458 N.E.2d 1360.) Because respondent's contribution of personal efforts was both significant and resulted in substantial appreciation of the farm, we affirm the circuit court's determination that the marital estate was entitled to reimbursement for that contribution and that petitioner was properly awarded one-half of that reimbursement.

Respondent's next contention on appeal is that the circuit court erred when it ordered him to pay petitioner $16,200 for her homemaker contribution. He argues that since petitioner worked outside the home, and since petitioner failed to show that her contribution as homemaker was greater than respondent's contribution to the home, the circuit court abused its discretion when it awarded her the sum of $16,200. We agree.

In this case, petitioner was an expert horsewoman and respected in her field for her ability to train and to show horses. Prior to her marriage to the respondent, she obtained a bachelor's degree from Smith College and a partial master's degree from Murray State University. At Murray State University, petitioner set up a riding program and conducted courses on breaking and training horses and on various levels of western and English horsemanship. After college she became self-employed as a horse trainer and an instructor. She also worked as a veterinary assistant. After her marriage to the respondent, petitioner worked approximately a thousand hours on the farm, but after the establishment of High Meadows Stables, she spent less time working on the farm and more time working at the stables. The High Meadows Stables became operational in late 1977 and early 1978, within a year of the parties' marriage. Petitioner testified that out of her earnings she contributed to 50% of the family's expenses. She stated that she did such homemaker chores as cooking and cleaning, but as her business at the stables increased, a cleaning lady was

hired to come in once a week. She further testified that she renovated and redecorated the house in which she and respondent lived. According to petitioner, she also helped to take care of respondent's two children from a previous marriage when they came to live with them in 1980, in addition to caring for their daughter, Kathryn Elizabeth, born on April 15, 1981.

In contradiction to petitioner's testimony regarding her homemaker's contribution, respondent testified that petitioner often worked late at the stables. When she did so, respondent assumed the responsibility of caring for Kathryn. Additionally, respondent would take care of Kathryn in the mornings when petitioner was asleep after working late the night before. Although petitioner testified that she had the care of respondent's two children of a previous marriage, Lisa and Alexandria, who were approximately 11 years of age and 10 years of age, respectively, when they came to live with respondent and petitioner, she also testified that the children helped out with the household chores.

The testimony revealed that petitioner and respondent travelled on the average of every other weekend in order for petitioner to compete at various horse events. When they travelled, they slept in motels and ate out at restaurants. From this evidence, the circuit court determined that petitioner was entitled to a payment of $16,200 for her contribution as a homemaker. We find that the circuit court abused its discretion when it so ordered.

■■ Section 503(d)(1) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 503(d)(1)) provides for the consideration of a homemaker's contribution and states as follows:

"In a proceeding for dissolution of marriage or declaration of invalidity of marriage, or in a proceeding for disposition of property following dissolution of marriage by a court which lacked personal jurisdiction over the absent spouse or lacked jurisdiction to dispose of the property, the court shall assign each spouse's non-marital property to that spouse. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:

(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit ***." (Ill. Rev. Stat. 1987, ch. 40, par. 503(d)(1).)

In addition to the homemaker's contribution, 10 other factors are to

be considered by a circuit court when distributing marital property. (Ill. Rev. Stat. 1987, ch. 40, pars. 503(d)(2) through (d)(11).) It is apparent that the contribution of a party as a homemaker is but one factor to be considered by a circuit court for the purpose of equitably dividing marital property and it is not to be considered as a separate marital asset. The purpose of the homemaker contribution was to acknowledge the *unquantifiable* domestic contribution of a spouse and to provide economic credit in the distribution of property. Ill. Ann. Stat., ch. 40, par. 503, Historical and Practice Notes, at 470 (Smith-Hurd 1980).

This court has held that "[i]n determining whether the trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court, but whether the trial court acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." (*In re Marriage of Aud* (1986), 142 Ill. App. 3d 320, 326, 491 N.E.2d 894, 898.) It is our opinion that the circuit court went outside the authority and the purpose of section 503(d)(1) when it arbitrarily ascribed a monetary value to petitioner's homemaker contribution. There was nothing in the record upon which we can determine that the circuit court based its decision but instead we can only conclude that the circuit court simply chose a random figure for this value. This action by the circuit court goes against all reason, and to allow a circuit court to assign a monetary value to this statutory factor as the circuit court did here would set a troublesome precedent. There was no reasonable and objective method in this record by which the circuit court could have obtained a value for petitioner's homemaker contribution; therefore, we reverse the circuit court's determination that respondent must pay petitioner the sum of $16,200 for her contribution as homemaker.

Additionally, the circuit court's determination of petitioner's homemaker contribution cannot stand as petitioner has not demonstrated that her contribution to the home was greater than that of respondent. Petitioner worked outside the home at the stables and apparently devoted considerable time and effort to this occupation. It has been held that "[w]here both parties worked outside of the home during the marriage and one spouse wants additional credit for his or her contributions as a homemaker, that spouse must show that she made a greater contribution as a homemaker than did the other." (*In re Marriage of Banach* (1986), 140 Ill. App. 3d 327, 336, 489 N.E.2d 363, 369.) The petitioner has failed to show that her contribution was

greater than respondent's, and the circuit court's award of $16,200 for petitioner's homemaker contribution cannot stand.

Respondent next contends that the circuit court erred in its determination that specific personal property was marital property and that the circuit court's assigned value of this personal property was erroneous. The items of personalty which respondent alleges were nonmarital or were erroneously valued are some cattle, a 28-foot sailboat, the proceeds of a sale of a 4520 John Deere tractor, a 1973 GMC white and green tractor-truck, a Phillips horse trailer, and a GMC C-65 tractor-truck and King trailer. Respondent has presented separate arguments for each of these items and so we too shall address these items individually.

In the circuit court's judgment for dissolution, it found that the parties had acquired cattle during the marriage and that the cattle were to be valued as follows:

> "(j) Five (5) bulls at $1,000 each       $ 5,000.00
> (k) Ten (10) heifers at 900 pounds
>      at .45 cents per pound       $ 4,050.00
> (l) Ten (10) calves at 350 pounds
>      at .60 cents per pound       $ 2,100.00
>
>     TOTAL VALUE OF MARITAL CATTLE     $11,150.00"

Respondent claims that there is no evidence to support the circuit court's finding that the cattle were acquired by the parties during their marriage. He argues that because a herd of cattle were on the farm prior to the marriage and were the property of the Arthur Tatham trust, the circuit court erroneously determined that the marital estate contributed cattle to this nonowned herd and was thus ordering reimbursement to the marital estate. Respondent further contends there is no evidence to support the circuit court's determination that the bulls were worth $1,000 each and that there is also no evidence to support the circuit court's finding that the marital estate acquired 10 calves.

At trial, both respondent and petitioner testified that new stock cows were purchased after the parties' marriage. The evidence showed that respondent bought a bull from a third party in 1984 for $1,000. Respondent and petitioner testified that there were bulls acquired and that there were calves born during their marriage. Respondent testified that in 1986 he sold 30 steer calves at 350 pounds each for $.50 per pound. At the time of trial, respondent advised the circuit court that the herd on the farm currently consisted of 100 cows and 60 calves. Respondent stated that on the average his cows

weighed 900 pounds. Petitioner's appraiser's testimony established that the price per pound at cattle sales in Johnson County was $.40 to $.50 per pound for cows, $.60 per pound for calves and $.50 per pound for steers. It was petitioner's testimony that at least 10 cows and 4 or 5 bulls were acquired during the marriage, but this testimony was not rebutted by respondent.

■ We find that there was evidence before the circuit court upon which it could make its determination regarding the cattle. While the evidence was not precise as to the number of cows, calves and bulls acquired after the marriage, it is clear that cattle were acquired during the marriage. Section 503(b) presumes that all property acquired after a marriage and before the date of dissolution is marital property. (Ill. Rev. Stat. 1987, ch. 40, par. 503(b).) It is the party who contends that the property is not marital who must rebut this presumption.

■ In this case, as in many dissolution cases, the circuit court was given vague information and was expected to make a determination on the property. Where a circuit court lacks solid evidence as to value of property in question, this court has held that it will not continue to reverse and to remand dissolution cases where the parties had an adequate opportunity to introduce evidence but have failed to do so. (*In re Marriage of Schaufelberger* (1983), 120 Ill. App. 3d 114, 457 N.E.2d 993.) This case is just such a case. If we were to reverse and remand this case on the basis that there was inadequate evidence as to the number of cattle that were marital property, we would place the circuit court in an even more difficult position. Distance in time would not make this determination any easier and the evidence needed to prove this would become more elusive, if any clear evidence of exactly how many cows, calves and bulls were acquired during the marriage ever existed. Therefore we affirm the circuit court's decision with regard to the characterization of these cattle.

■ The next item of personalty which respondent contends the circuit court erroneously held to be marital property is a 28-foot scow sailboat. Respondent argues that because this sailboat was purchased with the proceeds of the sale of securities given to him as a gift by his parents prior to the parties' marriage, *i.e.*, nonmarital property, the sailboat was also nonmarital property. Petitioner contends that the sailboat was a gift to the marital estate.

At trial, the testimony adduced established that this sailboat was acquired by the parties in September 1977, after the marriage of the parties. Petitioner testified that the sailboat was purchased for $3,000 to $3,500 and that it was "jokingly" referred to as her wedding

present. She went on to say that the sailboat was for her, for respondent and for the children for recreation. Respondent testified that the sailboat was purchased from the proceeds of the sale of 250 shares of Fort Dearborn Income Securities which were given to him as a gift by his parents prior to his marriage to the petitioner. An exhibit admitted into the record of the sale of various of respondent's securities showed that respondent had sold the aforementioned securities for the sum of $3,781.25 on September 9, 1977. Respondent, at the hearing on July 5, 1984, had testified that the purchase price of the sailboat was $2,200, but at trial he testified that the purchase price of this asset was $3,500. When respondent was questioned regarding whether the sailboat was intended as a wedding present for petitioner, he responded "I doubt it." Petitioner had testified that during their marriage, respondent's income had derived from stocks and bonds, from income as manager of the farm, from beef, from custom farming, and from vanning horses. Respondent had testified that during the marriage he had sold approximately $60,000 of various securities in order to purchase various items and to meet living expenses of the marriage. This constituted the evidence before the circuit court regarding the sailboat. No evidence of title of the sailboat was placed in the record, so it is unknown whether the title of the sailboat was in respondent's name alone or whether it was held in joint tenancy.

As stated previously, under section 503(b) all property acquired during a marriage is presumed to be marital property. This rebuttable presumption can be overcome if it is shown that the property was acquired through one of the six methods enumerated in section 503(a). Respondent's contention is that he has rebutted the presumption as he has shown that the sailboat was "property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, legacy, or descent," one of the six methods given in the statute. (Ill. Rev. Stat. 1987, ch. 40, par. 503(a)(2).) In this respondent is correct. He has shown that the sailboat was nonmarital property as it was purchased with nonmarital funds. However, even though the sailboat was nonmarital property, the question to be considered is, did respondent intend to make a gift of the sailboat to the marital estate?

■ In this case, the issue of whether the sailboat was intended as a gift is a close question. None of the factors that would overcome the presumption of gift, *i.e.*, making of improvements, payment of taxes and debt, and the exercise of control and management of the item, are present to enlighten us in this determination. (*In re Mar-*

*riage of Wojcicki* (1982), 109 Ill. App. 3d 569, 440 N.E.2d 1028.) The determination of whether the sailboat was a gift became a question of fact for the circuit court. There was conflicting testimony by respondent and by petitioner, thus the issue was one of credibility. The circuit court was in the best position to judge the witnesses' credibility and it decided that the petitioner's testimony regarding this asset was more credible and found that the sailboat was a gift. *In re Marriage of Legge* (1982), 111 Ill. App. 3d 198, 443 N.E.2d 1089.

■■ The very nature of this item would also lead to the conclusion that the sailboat was for the use and the enjoyment of respondent's family and not to be used by him alone. On appeal, "all reasonable presumptions are in favor of the action of the trial court, and the burden is on the appellant to show affirmatively the errors assigned on review." (*In re Marriage of Smith* (1985), 132 Ill. App. 3d 694, 702, 479 N.E.2d 929.) Respondent has not met this burden; therefore, we agree with the circuit court's characterization of this asset as marital property.

■■ Respondent next contends that the circuit court erred in finding that a 4520 John Deere tractor acquired before the marriage of the parties was marital property. He states that since the property was acquired before the marriage and since the loan for this property was paid off out of farm funds, *i.e.*, nonmarital funds, the tractor was nonmarital and petitioner was not entitled to one-half the proceeds of the sale of the tractor. Petitioner argues that the tractor was purchased prior to the marriage, but that since it was purchased in contemplation of the marriage, it was properly considered marital property. We agree with petitioner that the circuit court properly considered this property a marital asset but not for the reason urged by petitioner. We cannot find that a tractor is comparable to a marital home or to furniture for a marital home purchased prior to a marriage and which have been held to have been purchased in contemplation of marriage. (See *In re Marriage of Ohrt* (1987), 154 Ill. App. 3d 738, 507 N.E.2d 160; *In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 478 N.E.2d 1068; *Stallings v. Stallings* (1979), 75 Ill. App. 3d 96, 393 N.E.2d 1065.) However, we do find that it was reasonable for the circuit court to have determined that the loan on the tractor was paid during the marriage out of marital funds and that the nonmarital tractor purchased prior to the marriage was transmuted into marital property because of this commingling of marital and nonmarital assets. According to section 503(c)(1) of the Illinois Marriage and Dissolution of Marriage Act, where nonmarital property is commingled with marital property such that the identity of the property is lost,

the classification of the contributing property is transmuted to the estate receiving the contribution. (Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(1).) Such is the case here.

The evidence before the circuit court regarding the tractor was that it was purchased in March 1977, approximately two months prior to the marriage. The tractor was purchased for $10,500 through a loan. The loan for the tractor was paid off in March 1980, from the proceeds of the 1979 cattle and grain sales of the farm. The tractor was sold in 1985 for $5,000. As was previously discussed, bulls, cows and calves were acquired during the marriage of the parties and thus were marital property. The petitioner testified that she and respondent bought and sold cattle, that they used the funds from the sale of the cattle for personal as well as farm expenses, that she worked hard with the cattle and that she expected to have an income from the cattle.

Respondent argued in his brief that the tractor was property of the farm; however, he testified at trial that he depreciated this asset on his and petitioner's joint tax return, which evidence suggests that he considered the tractor his property and contradicts his argument that the tractor was farm property. Further, respondent had established a farm bank account at the First State Bank of Vienna in 1976, prior to the creation of the Arthur Tatham trust. The evidence adduced showed that respondent used this account for both his personal funds as well as for the farm. He had deposited the funds from the cattle sales into this account. As we previously noted, the cattle on the farm consisted of nonmarital property and marital property. Because of this commingling of these assets, there is no clear method for tracing the source of the funds from the cattle sales to determine which monies were marital and nonmarital. In this case, the evidence before the circuit court was not clear, but the evidence was such that reasonable men could differ as to the determination and the evidence was not against the manifest weight of the evidence. While a reviewing court may disagree with a circuit court's factual determination or may come to a different conclusion, a circuit court's decision will not be overturned if the evidence supports the decision. (*Ohrt*, 154 Ill. App. 3d 738, 507 N.E.2d 160.) Therefore, we find that the circuit court's decision that the tractor was marital property was not an abuse of discretion.

■■ The next item of personal property that respondent contends the circuit court erroneously determined to be marital property is a 1973 GMC white and green tractor-truck. His argument is that this tractor-truck was purchased after the separation of the parties and

that the loan taken out to purchase this property was paid off by trust monies, nonmarital funds, and therefore, this personalty is nonmarital property.

Initially, the fact that the tractor-truck was purchased after the separation of the parties does not make the property nonmarital. Under section 503(b), any property acquired before the date of dissolution is presumed to be marital property. It is the date of dissolution and not the date of the parties' separation that is determinative as to what property was acquired during a marriage. (*In re Marriage of Brooks* (1985), 138 Ill. App. 3d 252, 486 N.E.2d 267.) The tractor-truck was purchased in January 1985, before the date of dissolution. The presumption is that this tractor-truck was acquired during the marriage and that it is marital property.

Secondly, respondent contends that the tractor-truck was purchased with trust funds which are nonmarital funds. The evidence shows that there were three bank accounts that were trust accounts, one in Naples, Florida, one in Wilmette, Illinois, and one in Chicago, Illinois. No evidence was presented that any of the funds for this item came out of any of these trust accounts. As noted previously, respondent had established a farm account in which he commingled marital and nonmarital funds. It was as reasonable for the circuit court to hold that the funds used to pay for the tractor-truck were marital funds as it was for it to conclude that the funds were nonmarital. We find that the circuit court's determination that the tractor-truck was marital property was not against the manifest weight of the evidence.

Respondent next contends that the Phillips horse trailer was erroneously determined by the circuit court to be marital property. Respondent concedes that this item was purchased during the marriage (May 1980), but that the horse trailer was transmuted from marital property to nonmarital property as the loan on this trailer was not paid off by the parties but was paid by funds from the trust. We do not agree.

The Phillips horse trailer and a C-65 tractor were purchased in 1980. To purchase these items, a $25,000 loan agreement was executed between respondent and the First State Bank of Vienna. Respondent contends that this loan was ultimately paid off when the trust paid $26,088.16 into his farm account in January 1986. We cannot find that the evidence supports respondent's assertion that this payment by the trust, in which respondent was a vested beneficiary at the time of trial, was for payment of the Phillips horse trailer. Several loan agreements appear in the record. One loan, for $25,000 was executed in October 1980. Another loan agreement, for $50,117.81, was

executed in January 1983. A subsequent loan agreement for $26,088.16 was executed in February 1985. Several items of personalty, including the Phillips horse trailer, were used as collateral to secure these loans. From this evidence it cannot be determined that the $26,088.16 paid out of respondent's nonmarital funds was the money used to pay for this property. The evidence presented at trial established that various loans were paid through cattle sales (marital funds) and through the proceeds of sales of respondent's securities (nonmarital funds). Additionally, the Phillips horse trailer was purchased for use of the stables where petitioner worked. We cannot conclude that the circuit court's determination that this property was marital property was against the manifest weight of the evidence.

■■ Respondent's last contention regarding the marital property is that the circuit court erred in its valuation of a GMC C-65 tractor-truck and a King trailer. He does not contest the circuit court's characterization of this property as marital. He argues that the evidence showed that respondent received only $7,500, in money and in trade, for these two items combined. Therefore, he contends that the circuit court was in error when it found that the tractor-truck alone was worth $7,500 and that the King trailer was worth $4,500.

The petitioner had testified that respondent had sold the King horse trailer for $4,500 in 1984, but that he had not received the money for this property. Respondent testified that a price of $4,500 had been agreed to as the purchase price of the King trailer when he sold it to Glenn Cudmore. He further testified that Glenn Cudmore had traded three horses and had given $2,000 cash for both the tractor and the trailer. The original purchase price of the tractor alone when originally acquired by respondent was $6,000, but an additional $800 or $900 had been spent on the tractor to rebuild the motor. It is apparent that the circuit court's valuation of the tractor and the trailer was determined through evidence in the record. This court has held that a circuit court need not place a precise value on each asset but only that there be competent evidence of value in the record and that the circuit court's decision be supported by that evidence. (*In re Marriage of Holder* (1985), 137 Ill. App. 3d 596, 484 N.E.2d 485.) While respondent may not have received the purchase price on the trailer, that fact is irrelevant if the evidence shows that a willing purchaser would pay that price for the item. To not allow this value to be assigned simply because a party in a marriage has not received money from a sale would allow a party to dissipate marital assets by giving away marital property. We find that the circuit court had adequate evidence in the record to support its valuation of the King trailer and

the tractor-truck.

■■ The next issue respondent raises on appeal is that the circuit court abused its discretion when it ordered respondent to pay $750 per month child support for the parties' minor daughter. He contends that it appears the circuit court strictly applied the statutory guidelines by requiring him to pay exactly 20% of his income and that the circuit court failed to consider his obligation to support his three children by a former marriage and it failed to consider the actual needs of his daughter in determining the amount of support. From respondent's argument it appears he would have this court consider two of the five factors that are to be considered if a deviation from the statutory guidelines for child support is to be imposed, i.e., the financial resources and needs of the noncustodial parent and the needs of the minor child. (Ill. Rev. Stat. 1987, ch. 40, pars. 505(a)(2)(d), (a)(2)(e).) Respondent's argument is without merit.

Respondent appears to consider the circuit court's following of the statutory guidelines as an abuse of discretion because the circuit court did not consider the relevant factors enumerated in section 505(a)(2). However, the statutory factors enumerated in section 505(a)(2) are not to be considered if the circuit court is following the guidelines for child support as delineated in section 505(a)(1). (Ill. Ann. Stat., ch. 40, par. 505, Supplement to Historical and Practice Notes, at 120 (Smith-Hurd 1988).) Only if the circuit court were going to impose more or less than the minimum standard required under the statutory guidelines is a circuit court required to consider the relevant factors of section 505(a)(2).

This is not to say that the circuit court can blindly apply the statutory guidelines, and in this case, we do not determine that the circuit court did so. The circuit court apparently found no need to deviate from the statutory guidelines and ordered respondent to pay 20% of his annual income. The evidence before the circuit court supports its determination and we cannot but agree with the circuit court.

■■ Respondent claims that the circuit court failed to consider that he was obligated to support his three children of a former marriage. At the time of trial, respondent's oldest child was emancipated (19 years of age) and attending college. His other two children, ages 17 and 16, lived with him and respondent anticipated that he would be obligated to support these two children through college after their emancipation. Respondent has not claimed that he is legally obligated to support these children under any court order. If respondent's obligation is an ethical one, the circuit court was not obliged to consider this factor.

■ Respondent also argues that the circuit court failed to consider his minor daughter's actual needs. The same reasoning applied by the Illinois Supreme Court in *In re Marriage of Bussey* (1985), 108 Ill. 2d 286, 483 N.E.2d 1229, is applicable here. The supreme court in *Bussey* held that to consider "shown needs" of a minor child is in effect eliminating the consideration of the "standard of living the child would have enjoyed had the marriage not been dissolved." (*Bussey*, 108 Ill. 2d at 297, 483 N.E.2d at 1234.) In this case, the evidence revealed that respondent had a minimum income of $45,000 per year and that income was based primarily on passive income from respondent's bonds and securities. According to the record, respondent possessed nonmarital assets totalling over $1 million. Clearly, Kathryn, the parties' minor daughter, would have enjoyed a high standard of living if the marriage had not been dissolved. Further, respondent concedes that he is capable of paying the amount of child support, but he is apparently reluctant to do so. Therefore, we affirm the circuit court's judgment ordering respondent to pay $750-per-month child support.

We now address petitioner's issues raised in her cross-appeal. Petitioner's first issue is that the circuit court erred in denying her maintenance. She argues that she does not have enough property or income to meet her reasonable needs and that she is unable to maintain the high standard of living to which she was accustomed during her marriage, both factors that show that she was entitled to maintenance. She asks that this court reverse the circuit court's denial of a maintenance award and order respondent to pay her a lump-sum maintenance award of $100,000.

■ Section 504 of the Illinois Marriage and Dissolution of Marriage Act provides what factors a circuit court should consider in determining whether maintenance should be awarded and, if maintenance is to be awarded, it delineates what factors should be considered in determining the amount of maintenance to be imposed. (Ill. Rev. Stat. 1987, ch. 40, par. 504.) According to the statute, a circuit court may grant a maintenance order only if it finds that the spouse seeking maintenance:

"(1) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and

(2) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or

(3) is otherwise without sufficient income." (Ill. Rev. Stat.

1987, ch. 40, par. 504(a).)

After considering these factors, if the circuit court concludes that maintenance is appropriate, then section 504(b) provides the factors to be considered in calculating the amount of maintenance to be awarded. Whether maintenance is be to awarded or not and how much a maintenance award is to be are matters within the discretion of the circuit court, and unless a circuit court's decision is against the manifest weight of the evidence, a reviewing court will not overturn a circuit court's determination. (*In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 441 N.E.2d 336.) We find that the circuit court's decision in this case was not against the manifest weight of the evidence.

■■■ Under section 504(a), the first factor to consider for the necessity of maintenance is whether a spouse lacks sufficient property, including marital property received, to meet his reasonable needs. Here, petitioner's nonmarital property, consisting primarily of horses given to her by her father, totalled $9,600. As a result of the dissolution of the marriage, petitioner received the following marital property (minus the $16,200 homemaker's contribution reversed by this court in its previous discussion of that issue):

| | |
|---|---|
| Personal property divided by the circuit court | $26,450.00 |
| Marital property contributed to nonmarital property | $32,800.00 |
| TOTAL | $59,250.00 |

The $59,250 awarded is a cash settlement to buy out petitioner's one-half interest in the marital property, a substantial amount of property from which petitioner could meet her reasonable needs.

The second factor to be considered for the necessity of maintenance is one of two disjunctive factors, either the spouse is unable to support himself or is without sufficient income. The evidence presented at trial revealed that petitioner was 33 years of age and that she was in good health. Petitioner testified that she received a bachelor's degree from Smith College and that she had partially completed a master's degree from Murray State University. She was an accomplished equestrian. During her marriage, petitioner managed a horse stable located on respondent's property. No evidence was introduced of petitioner's income from this employment because of a stipulation entered into regarding the stables. At the time of trial, petitioner was employed as the manager of Wedgewood Farms, a horse riding stable, and able to support herself through appropriate employment.

Given this foregoing evidence, clearly petitioner received substantial marital property and she was able to earn an income through appropriate employment. Next, we must determine if the evidence demonstrated that this property and employment income was sufficient to meet the petitioner's "reasonable needs." What a parties' reasonable needs are varies from case to case. Here, petitioner advised the circuit court that her monthly expenses totalled $1,900. From petitioner's testimony, it would seem that this is the sum necessary to meet her reasonable needs. From petitioner's testimony, we calculated her monthly expenses to be $1,399.32. This amount reflects the subtraction of the $500 that petitioner included as her rent expense as petitioner lives in a house provided by her employment and she pays no rent. We have also only allowed $100 as the monthly expense for her telephone bill as petitioner testified that her monthly telephone expense was from $100 to $200 but that most of her calls were for business. Petitioner's testimony established that her daughter's monthly expenses totalled $77. From these figures, petitioner's and her daughter's total monthly expenses are $1,476.32. Petitioner testified that her salary in 1985 was $14,000, which makes petitioner's monthly income $1,166.66, a sum inadequate to cover her monthly expenses. However, in 1986, petitioner had additional income of $2,500 from commissions for selling the horses of others and of $1,000 for vanning other persons' horses. With this additional income, petitioner's monthly income in 1986 was $1,458.33. When the $750-per-month child support is added to this income, petitioner had a monthly income of $2,208.33, an amount which adequately meets petitioner's reasonable needs when considered with the $59,250 cash settlement she received from the marital property.

Petitioner contends that the circuit court did not give consideration to the difference in lifestyle that occurred after the parties' marriage was dissolved in considering whether maintenance should be awarded. We do not agree. During her marriage, petitioner lived in a home owned by another just as she currently lives in a house owned by her employer. Petitioner testified that she and respondent were not financially established in the early days of their marriage. Petitioner actively competed in horse events during the marriage, but she competed less after the birth of the parties' child. Petitioner still competes in horse events, albeit on a lesser scale. While petitioner contends that she cannot entertain as she did during her marriage or that she cannot attend movies as frequently as she did during her marriage, we do not find that these reasons substantiate petitioner's claim that her reasonable needs are not met. Therefore, we affirm the

circuit court's order denying petitioner maintenance.

▪▪ Lastly, we consider petitioner's second issue that the circuit court erred when it ordered respondent to pay only $990 of her attorney fees. She contends that because of the clear disparity of income and of assets between the parties, that the circuit court abused its discretion in not requiring respondent to pay all, or alternatively, a greater share of her attorney fees. Petitioner also contends that if she is required to pay her attorney fees that she will only be able to do so if she sells her nonmarital and marital property.

This court has previously held that it is the party for whom the services are rendered who has the primary obligation to pay attorney fees and that for a party to justify an award of attorney fees, it must be established that the party is unable to pay those fees and that the other party is able to do so. (*Holder*, 137 Ill. App. 3d 596, 484 N.E.2d 485.) Further, the award or denial of attorney fees is within the sound discretion of the circuit court and absent an abuse of discretion, a circuit court's determination will not be overturned on review. (*Stotlar v. Stotlar* (1977); 50 Ill. App. 3d 790, 365 N.E.2d 1097.) We cannot determine that the circuit court abused its discretion when it ordered respondent to pay only $990 of petitioner's attorney fees.

▪▪ From the evidence, petitioner is a young, able-bodied, well-educated woman. She was employed at the time of trial and was earning a regular income and there is no reason to doubt that she will not be able to continue to be employed. She demonstrated that she was an enterprising person in that she sold horses, sold horse equipment, and vanned horses in order to supplement her income. Additionally, she is to receive $59,250 as a cash settlement for her one-half share of the marital assets. The evidence revealed that her father gave her 15 or 16 horses as a gift and that she sold all but four or five of the horses, not to support herself, but because they would be expensive to maintain and because she wanted to pay off a debt of the stables that she formerly managed. Petitioner has not demonstrated that she is unable to pay her attorney fees but only urges this court to reverse the circuit court's order because respondent has substantial nonmarital assets. That is not the standard to be applied; therefore, we affirm the circuit court's determination that respondent only pay $990 of petitioner's attorney fees.

For the foregoing reasons, we affirm in part the circuit court's judgment for dissolution as it relates to the valuation and characterization of specific marital assets, as it relates to petitioner's being awarded one-half of the reimbursement for the contribution of the marital estate towards nonmarital property, as it relates to child sup-

port, maintenance and attorney fees, but reverse that portion of the circuit court's order in which it found petitioner's homemaker's contribution to be worth $16,200.

Affirmed in part and reversed in part.

KARNS and WELCH, JJ., concur.